**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
*Eastern Division*

| | |
|---|---|
| AVA DEAKIN, by her parents and next friends, WILLIAM J. DEAKIN and LISA M. DIEHLMANN, et al., <br><br>       *Plaintiffs*, <br><br>     v. <br><br> OLD TOWN TRIANGLE ASSOCIATION, <br><br>       *Defendant*. | Case No. 19-8229 |

## COMPLAINT AND JURY DEMAND

### NATURE OF THE ACTION

1.      Since August 2018, Defendant Old Town Triangle Association (the "Association" or "OTTA") has been engaged in a concerted campaign of resistance to prevent the addition of certain accessibility features to a single-family home in Lincoln Park that would benefit a fourteen-year-old girl, Ava Deakin, who uses a wheelchair. As part of this campaign, the OTTA and its leaders have taken actions and made public statements that indicate clear opposition to the people with disabilities living in their neighborhood. The OTTA's statements and actions amount to violations of the federal Fair Housing Act.

2.      Together with her parents, William J. Deakin and Lisa M. Diehlmann (collectively "Plaintiffs"), Ava brings this civil rights action pursuant to the federal Fair Housing Act ("FHA"), 42 U.S.C. §§ 3604 and 3617, to enjoin the OTTA's discriminatory actions and to secure other appropriate relief.

3.      At age 5, Ava was diagnosed with a neurological condition that causes progressive muscle weakness and spasticity in her lower extremities and may gradually eliminate her ability to walk. She has had multiple surgeries related to this condition and is in long-term physical therapy. Now, at age 14, she uses assistive devices for mobility, including Ankle Foot Orthosis and a wheelchair for muscle fatigue and distance.

4.      In 2015, her parents acquired the property at 1848 N. Lincoln Avenue in Chicago (the "Property"), a small apartment building that had become so dilapidated from years of neglect that neighbors had dubbed it the "rat house." Mr. Deakin and Ms. Diehlmann planned to renovate it to provide accessible living space for Ava, including an elevator to the upper floors and a connected garage at the rear of the Property in which to park their van so that Ava and her pathway into the home are not exposed to the elements. After renovations were complete, the family planned to move in.

5.      The Property is located within the Old Town Triangle "Landmark District," which imposes special requirements and restrictions upon modifications to the structures in the neighborhood, including the Property.

6.      With respect to their planned modifications, Mr. Deakin and Ms. Diehlmann secured approvals and permits from every relevant City of Chicago agency (and from many nearby neighbors), and followed written guidance from the Illinois Historic Preservation Division. Despite this, the OTTA has targeted the family with a campaign of unrelenting opposition, harassment, interference, and coercion, which has substantially delayed and obstructed the modifications necessary to permit Ava and her family to move into the Property. The OTTA's actions and statements also announced to prospective homebuyers that the neighborhood is not appropriate or welcoming for people with disabilities.

2

7.      As a consequence of the discriminatory actions and statements by the OTTA and its agents recited herein, the renovations at the Property remain unfinished, and the family has been unable to move into the home.

8.      The OTTA's actions described herein amount to disability discrimination in violation of the FHA and its implementing regulations at 24 C.F.R. Part 100. In passing the FHA's 1988 amendments, which added robust protection for people with disabilities, Congress clearly pronounced "a national commitment to end the unnecessary exclusion of persons with [disabilities] from the American mainstream." H.R. Rep. No. 711, 100th Cong., 2d Sess. 18 (1988), *reprinted at* 1988 U.S. Code Cong. & Admin. News 2173, 2179. Precisely such exclusion is at issue here.

9.      Lack of accessible housing is one of the key barriers to the independence, integration, and full citizenship for people with disabilities. That the OTTA's vitriolic discrimination on the basis of disability lies beneath the thinnest veneer of concern for historic preservation is nothing new—community resistance to people with disabilities is often shrouded in pretextual "quality of neighborhood" concerns that are designed to exclude. Nonetheless, the FHA prohibits that resistance where, as here, it is designed to make housing unavailable because of a person's disability; becomes harassing, coercive, and intimidating; indicates a preference with respect to the sale of a dwelling based on disability; or otherwise interferes with the enjoyment of rights guaranteed by federal law.

**JURISDICTION AND VENUE**

10.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), 28 U.S.C. § 2201, and 42 U.S.C. § 3613(a).

11.     Venue is proper in this District and division pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District and division and because the Defendant conducts its business in this District and division.

**PARTIES**

12.     Plaintiff Ava Deakin is the daughter of Plaintiffs William J. Deakin and Lisa M. Diehlmann and lives with the two of them in Chicago, Illinois. Ava has a disability that restricts her mobility and she uses assistive devices, including Ankle Foot Orthosis and a wheelchair.

13.     William J. Deakin is the father of Ava Deakin and the husband of Lisa M. Diehlmann, and lives with the two of them in Chicago, Illinois. He owns an interest in the Property located at 1848 N. Lincoln Avenue.

14.     Lisa M. Diehlmann is the mother of Ava Deakin and the wife of William J. Deakin. She owns an interest in the Property located at 1848 N. Lincoln Avenue.

15.     Defendant OTTA is a non-profit organization organized under the laws of Illinois "dedicated to enhancing the quality of life for residents who live in an area of the City of Chicago bounded by North Avenue, Clark Street, and the ghost of Ogden Avenue ('The Triangle')." *See* http://www.oldtowntriangle.com.

16.     In acting or omitting to act as alleged herein, the OTTA acted through its agents, and is responsible for the acts and omissions of its agents within the scope of their agency. In acting or omitting to act as alleged herein, each Officer, Director, or Chair of the OTTA was

4

acting within the course and scope of his or her actual or apparent authority pursuant to such agencies, or the alleged acts or omissions of each Officer, Director, or Chair was subsequently ratified and adopted by the OTTA as principal. Furthermore, the OTTA intentionally and successfully provoked its members to harass and intimidate the Deakin family, up to and including the commission of multiple acts of vandalism of the Property.

## FACTUAL BACKGROUND

17.     In 2010, the Property was placed on the market to be sold. It languished on the market until 2015, by which point it was disintegrating into a state of disrepair. The neighbors called the Property the "rat house" due to its dilapidated state and an unchecked rat infestation. Still, Plaintiffs were attracted to the home as it is located in an excellent school district and it is larger than their current home, making it better able to accommodate Plaintiffs' growing family.

18.     In 2015, Deakin and Diehlmann purchased and prepared to renovate the Property, which had previously been divided into four apartments, by converting it into an accessible single-family residence. The front door of the Property faces North Lincoln Avenue, where multiple sets of stairs prevent access to the building for Ava. The rear of the Property faces North Lincoln Park West, where an existing driveway leads to the back of the home. The Property is on an irregularly shaped lot that is substandard in size for the City of Chicago, and the current building on the property does not conform to the Chicago Zoning Ordinance.

19.     Plaintiffs hired an award-winning architect who had worked on two other homes within the Old Town Triangle that the National Register of Historic Places had identified as historically "Significant," and hired a professional services firm to guide them through the process of obtaining city permits.

20.     Notwithstanding the fact that the Property has not been identified as historically or architecturally "Significant"—and that the OTTA itself has only nominated it, along with 256 other properties, to the National Register of Historic Places Inventory as "Contributing" to the overall history and architecture of the neighborhood—Plaintiffs worked carefully for over two years on a design that would accentuate the home's historic nature, comply with all applicable zoning and landmark laws, rules, and regulations, and meet Ava's accessibility needs.

21.     Before beginning construction on the Property's accessibility modifications, Plaintiffs engaged in a six-month process with officials from the City of Chicago's Historic Preservation Division to ensure compliance with its requirements. As part of this process, city officials made three visits to the Property and reviewed dozens of proposal drawings. State of Illinois Historic Preservation officials also visited the Property during this period.

22.     The planned renovation included a complete restoration of the masonry façade and the historic windowlines, and incorporated Chicago common brick as the primary building material. The renovation also included the addition of rear livable space, an elevator, and an attached garage of sufficient size to accommodate the loading and unloading of an accessible vehicle and to provide an accessible entry to the home protected from the elements. The plans called for an historic carriage-house style door for the garage, rather than a typical aluminum mechanical door.

23.     Plaintiffs went to great lengths to ensure the design complied with the strictest interpretation of historical restoration, even relying upon other garages located in the district as inspiration for their design and seeking input from a curator for the Art Institute of Chicago. Plaintiffs' efforts won them the approval of the Illinois Historic Preservation Division.

24.     On November 17, 2017, the City of Chicago Department of Buildings granted a permit for the construction.

25.     In or around April 2018, after Plaintiffs' architect submitted a request for a routine building permit revision, the Department of Buildings realized it had mistakenly granted the initial permit without the necessary zoning variances related to setbacks. The Department of Buildings then denied the permit revision, and on July 9, 2018, Deakin and Diehlmann petitioned the City of Chicago Zoning Board of Appeal ("ZBA") for a variance that would allow them to begin construction of the garage.

26.     Seeking input from the OTTA, Deakin and Diehlmann attended the August 15, 2018 meeting of the OTTA's Historic District/Planning & Zoning Committee ("HD/PZ"). The OTTA is a self-styled "liaison between the Old Town Community and the Landmarks Commission" that seeks to preserve the historic character of the neighborhood by "consider[ing] requests for proposed exterior changes to existing buildings, new construction, and applications for zoning changes in the Triangle." *See* http://oldtowntriangle.com/about/committees/historic-district-planning-zoning-2/. As such, it enjoys considerable influence with both the Landmarks Commission and the office of the Alderman of the 43rd Ward.

27.     OTTA leaders have repeatedly made it clear that they consider themselves gatekeepers with respect to zoning, land use, and building matters within the Old Town Triangle. For example, in its own newsletter, the OTTA has stated that HD/PZ "will still be the entity that homeowners, contractors, or developers seek to approve plans to renovate their homes" and that it "reviews plans for what neighbors would like to do with their properties" in support of its organizational goal to "support[]/enforc[e] the Landmark Guidelines for the Old Town Triangle." The OTTA often takes responsibility for blocking modifications it deems inconsistent with the

7

neighborhood's historic character. The OTTA expects owners seeking to modify their homes to consult with it prior to beginning construction, and has complained both in its email newsletter and in a subsequent press release that Plaintiffs did not seek the OTTA's approval at the beginning of their planning process.

28.     OTTA President Karen Pfendler described the organization's role in the neighborhood in a June 15, 2018 letter to the Landmarks Commission when she wrote, "We expect you to direct developers/homeowners to our HD/PZ Committee for guidance." At both the October 29, 2018 HD/PZ meeting and at the ZBA hearing on December 21, 2018, she told Plaintiffs that they should have only bought the home after confirmation that their modification plans would be approved by the OTTA.

29.     Communications from the office of Michele Smith, the Alderman of the 43rd Ward, to Mr. Deakin and Ms. Diehlmann reinforce that, in practice, the OTTA exercises a significant degree of control over the terms, conditions, and privileges of the ownership of a dwelling in the Old Town Triangle. When the Landmarks Commission unexpectedly added Plaintiffs' project to the hearing calendar in September 2018, the Alderman's office called Ms. Diehlmann to complain that consideration by the Commission would be premature before the dispute with the OTTA had been resolved. On August 1, 2018, Alderman Smith told Mr. Deakin and Ms. Diehlmann that before they went to Zoning or Landmarks, they needed to meet with the OTTA's HD/PZ Committee.

30.     The OTTA is a powerful and well-organized neighborhood institution. As of July 2019, the OTTA claimed 425 voting members and 625 total members. Its Board of Directors and its ten committees meet regularly. On more than one occasion, the OTTA has hired counsel and architects to help them enforce the Landmark Guidelines.

8

31.     Whether by formal authority or custom and usage, the OTTA has exercised its considerable gate-keeping authority to discriminate against Plaintiffs in the terms, conditions, and privileges of sale of a dwelling because of Ava's disability.

32.     At the August 15, 2018 HD/PZ meeting, the OTTA's leaders launched their campaign of written and oral statements indicating the OTTA's dispreference, on the basis of disability, for both Plaintiffs' accessibility modifications and their residence in the neighborhood. A reasonable reader or listener would construe these statements as announcing to the public that the OTTA and its leaders prefer not to have people with disabilities purchase or rent homes in their neighborhood, and that it may take discriminatory action against those who seek to do so. For example:

a. Jordan Matyas, Chair of the OTTA's Historic District/Planning & Zoning Committee (HD/PZ) and a member of the Board of Directors of the OTTA, at an August 15, 2018 meeting of the committee (which was attended by Mr. Deakin and Ms. Diehlmann) posed questions regarding the purchase of the Property: "[W]hy would a family with your needs buy a house in a neighborhood like ours?" and "Please don't take any offense, but why again would a family in your situation buy a house in an historic neighborhood?"

b. At that same meeting, Sachi Kubo, a member of the HD/PZ Committee and a member of the Board of Directors of the OTTA, also made statements regarding the purchase of the Property, including, "[N]o, this is not the neighborhood for your family . . . suburbs are probably better for you . . . There is a home for sale over on another street outside our neighborhood that is probably better for you," and explained that having a child with a disability is like having a big luxury

car—big luxury cars don't fit in small historic garages and people with disabilities don't fit in these buildings.

    c. Diane Gonzalez, the in-house historian for the OTTA and a member of the HD/PZ Committee, declared that she would "never let [Plaintiffs] do what [they] want to do."

33. On the same day, the OTTA sent a letter to Mr. Deakin and Ms. Diehlmann informing them of its opposition to the request for the zoning variance. Matyas filed a complaint on behalf of the OTTA with the Department of Buildings on September 15.

34. The OTTA quickly began intensifying its campaign against the family, taking the following actions to coerce, threaten, intimidate, and interfere with Plaintiffs' enjoyment of their fair housing rights:

    a. On September 11, 2018, Alan Lougee, then a member of the OTTA and now a member of the Board of Directors, called Deakin and told him "You wouldn't want to be like [another neighbor renovating] that everybody hates."

    b. Deakin and Diehlmann first met with Alderman Smith on August 1, and then attended a second such meeting on September 18, 2018, to hear complaints lodged by neighbors opposed to the project. Just hours after the second meeting, and at the behest of the OTTA, the Department of Buildings posted a stop work order at the construction site. Dan Baldwin, a past-president of the OTTA who previously led the HD/PZ Committee and currently serves on the OTTA's Neighborhood Improvement Committee, sent Mr. Deakin a text with a photo of the stop work order, adding "Welcome to old town."

c.  Shannon Waterfield, a member of the HD/PZ committee, chair of the OTTA's Neighborhood Improvement Committee, and Secretary of the OTTA, came to the Property on the afternoon the stop work order was posted to take pictures and, in the presence of Mr. Deakin, bragged to her relatives, "It was my committee that had this done."

d.  Baldwin later sent a text to Mr. Deakin saying "Hopefully you are changing your plans or sell the project," "Lots of people mad . . . letters etc to city and emails spinning by neighbors Alderman is going to block," and "Not a good entry to the community."

35.  On September 20, 2018, Lawrence M. Shure, a Planner with the City of Chicago's Bureau of Planning, Historic Preservation and Sustainability, emailed Deakin and Diehlmann with recommendations for edits to their designs, and asked if they intended to discuss their proposed designs at the October 4, 2018 meeting of the Landmarks Commission Permit Review Committee. Plaintiffs incorporated all of Shure's recommendations into the plans they submitted to the Department of Buildings.

36.  On September 28, 2018, Steve Weiss, in his official capacity as President of the OTTA, sent an email to Alderman Smith, Matyas, Gonzalez, the OTTA Board, and various other Chicago and State of Illinois officials. In this email, Weiss wrote:

a.  "I understand that the people who purchased the house have a child that requires special needs. What I don't understand is why they chose to buy a house in a Landmark Zone when you have those needs. I don't mean to be heartless or uncaring but this is not the neighborhood for that,"

b.  "They should have . . . moved to a neighborhood more conducive to their needs,"

11

     c.   "**Do not approve this request to have a garage built. If you do, I will have my lawyers contact you immediately about building my garage and my friends across the street will do the same.**" (emphasis in original).

37.    The email was signed, "Steve Weiss, 314 W. Menomonee Street, President – OTTA." Neither Matyas, nor Gonzalez, nor any member of the OTTA Board disclaimed or objected to any part of the email.

38.    At the October 29, 2018 HD/PZ meeting, Matyas offered to give Plaintiffs a list of other neighborhoods that would be better suited for a child with a disability.

39.    At that same meeting, OTTA members admitted to privately observing Ava's condition at the Deakin's current residence and claimed that she was not disabled enough to require an accommodation because she sometimes uses a brace to walk instead of a wheelchair. This admission left the family feeling anxious and unsafe. Ava herself was shocked, intimidated, and unsettled knowing the OTTA had taken these actions.

40.    The OTTA's animus toward people with disabilities has not been limited to Ava and her family. When the local branch of Chase Bank sought to install a permanent wheelchair ramp in front of the bank in July 2019, the OTTA mobilized its membership in opposition, eventually forcing the bank to abandon the plan.

41.    The OTTA next sought to engage the broader public in its campaign to harass and intimidate Plaintiffs into leaving the neighborhood. On November 9, 2018, it sent an e-mail to approximately 600 OTTA members, encouraging them to sign a "Change.org" petition targeting Plaintiffs and to "contact Alderman Smith and the City of Chicago (Zoning Board) to ask that they ***deny*** the property owners' landmarks and zoning requests" (emphasis in original). Notwithstanding the recommendations of the professional staff of the Landmarks Commission,

the OTTA claimed that the project would "***dramatically damage*** the historical significance of one of Chicago's most historically relevant streets" (emphasis in original). The email also asked members to attend the hearings before the Landmarks Commission and the ZBA.

42.     In or around October and November 2018, the OTTA also launched a public relations effort against Plaintiffs by pitching local media outlets to write negative stories about Plaintiffs' accessibility modifications.

43.     Despite the increasingly antagonistic opposition from the OTTA and its claims to speak for the neighborhood, Plaintiffs' Old Town Triangle neighbors were generally supportive of their accessibility renovations. Approximately twenty residents of the Old Town Triangle sent supportive letters, emails, and text messages, many of them objecting to the discriminatory animus displayed by the OTTA.

44.     As word of the OTTA's discriminatory statements spread, it hired an architect to hastily, and without consultation with Plaintiffs or the Landmarks Commission, draft an unworkable alternative modification proposal for the Property. This proposal would have involved excavating the entire first floor, placing the structural integrity of the home and neighboring homes at risk while eliminating the barrier-free living space designed for Ava's needs.

45.     The Homeowners Association for the twelve owners of the condominiums next door to the Property offered a letter of support to Plaintiffs, noting that they had worked well together on a Party Wall Agreement that governed the construction. The Homeowners Association sent a second letter expressing that they were "strongly opposed" to the OTTA's alternative renovation plan for the Property, citing the plan's unprecedented requirement that Plaintiffs park a car in the interior of the main structure, the risks related to creating an

13

underground garage, and its adverse environmental impact. The Homeowners Association "implore[d]" the City of Chicago and the OTTA to allow Plaintiffs to proceed with their previously approved plans.

46.     One letter, sent by the owners of 1639 N. Sedgwick on November 19, 2018, objected to "members of the community [that] have expressed the sentiment that because of preservation restrictions in the neighborhood, our neighborhood is not the place for people with special needs." The letter emphasized that "[o]ur community is a place for people of all needs, and all people should feel welcome here."

47.     On December 11, 2018, another neighbor sent a letter criticizing the "reprehensible" letter sent by Weiss, and its misrepresentation of his "aberrant views as being those shared by most of [the] Old Town constituents by signing his title to the letter." The neighbor explained that Weiss "showed no contrition" upon confrontation about the letter. This neighbor also criticized the OTTA's alternative renovation plan, stating that it "has arguably little to do with historic preservation."

48.     On September 28, 2018, the same day that Weiss emailed his letter, Alderman Smith asked to delay the presentation to the Landmarks Commission until after the October meeting. Deakin and Diehlmann sent an email response to the Alderman agreeing to the deferral of consideration, and re-emphasized their "100% commitment to follow the Alderman's direction, and to act in a responsible way, in every aspect of this project." They met again with the Alderman on October 4, 2018 and October 12, 2018 to review the drawings, making significant changes to improve the historical character of the renovations as a result.

49.     On November 1, 2018, the Landmarks Commission issued a Draft Recommendation, finding that the project "meets the criteria set forth in the Commission's Rules

and Regulations, the Commission's Guidelines for Alterations to Historic Buildings and New Construction, and Standards 4, 9 and 10 of the U.S. Secretary of the Interior's Standards for Rehabilitation of Historic Buildings and *therefore, the project will not have an adverse effect on the significant historical and architectural features of the landmark property or district*." (emphasis added). The Draft Recommendation proposed approval of Plaintiffs' accessibility plans.

50.    After multiple preliminary approvals, the Landmarks Commission, on a vote of 3-0, gave final approval to the accessibility plans on January 10, 2019. At that meeting, the staff noted two other instances of newer garages approved by the Commission for construction in Old Town within the last decade.

51.    The Commission also concluded that there is no historical significance to the parking pad and coal house currently occupying the space where Plaintiffs seek to build a garage; in short, the Commission decided the project would not eliminate any historically significant elements of the property.

52.    On December 21, 2018, the five-member ZBA held a hearing to consider the requested variances. Current OTTA President Karen Pfendler; Alan Lougee, a member of the OTTA's Board of Directors; his wife, OTTA member Janet Lougee; Denise Arnold, the architect hired by the OTTA; and Gonzalez all testified. The OTTA was represented by legal counsel. In addition, the Mayor's Office for People with Disabilities and the Chicago Commission on Human Relations sent letters to the ZBA supporting Plaintiffs' accessibility plans.

53.    The following testimony was offered at the hearing:

    a.    President Pfendler testified that she did not believe that living without a garage was a hardship and suggested that Plaintiffs' van for Ava should just "park on the

15

streets." She did, however, admit that 71 buildings in the Old Town Triangle already have garages: one out of every five buildings.

b. Even though the Landmarks Commission—not the ZBA—determines whether a proposed project meets the historic requirements of a neighborhood, Janet Lougee testified that people "should not be building buildings" within an historic neighborhood.

c. Howard Stoller, a longtime resident of the Old Town Triangle, noted that many residents of Old Town had added nonconforming elements to their houses that were not similarly opposed; indeed, one of the petitioner-members of the OTTA at the hearing had a two-and-a-half story glass block atrium wall constructed on her property.

d. At one point, Alan Lougee shouted that instead of moving to the Property, Plaintiffs should "Stay where they are."

54.    After taking 90 minutes of testimony, allowing cross-examination of witnesses, and considering all relevant evidence, the ZBA unanimously voted to approve the petition for variances, finding:

a. "[S]trict compliance with the regulations and standards of the Chicago Zoning Ordinance would create practical difficulties or particular hardships for the subject property," as the lot is substandard and irregularly shaped.

b. "The requested variation protects the character of established residential neighborhoods . . . promotes rehabilitation and reuse of older buildings . . . [and] maintains a range of housing choices and options."

16

     c.   After noting the "careful design" to "fit within the character of the District," the ZBA concluded that "The variation, if granted, will not alter the essential character of the neighborhood."

     d.   The ZBA also observed that the conditions applying to the petition "would not be applicable, generally, to other property within the same zoning classification," and thus would not establish any precedent for other property owners to make similar additions.

55.    Having lost before the ZBA, and having failed to secure the support of any governmental department or independent historic preservation organization, the OTTA escalated its harassment and interference efforts on March 28, 2019 by filing a lawsuit in the Circuit Court of Cook County, Illinois against the ZBA, each member of ZBA in their official capacities, Deakin, Diehlmann, and the Trusts that hold a beneficial interest in the Property. In its lawsuit, the OTTA raised new arguments against Mr. Deakin and Ms. Diehlmann—arguments it did not see fit to raise before the ZBA.

56.    The OTTA did not file the Circuit Court lawsuit expecting it would prevail. Rather, it filed its complaint without a reasonable basis in law or fact, and in pursuit of the illegal objective of blocking accessibility modifications to the Property. The OTTA has litigated it for the sole and improper motives of delaying, obstructing, or interfering with Plaintiffs' ability to move into the Property; harassing, coercing and intimidating Plaintiffs into relinquishing their rights under the Fair Housing Act; forcing Plaintiffs to spend money on attorney's fees; and sending a message to other people with disabilities that they will face unrelenting opposition if they attempt to move into the neighborhood. In other words, it is a sham lawsuit.

57.     After filing the Complaint, OTTA Spokesman Mike Fourcher explained to a journalist that it would be a slippery slope to make exceptions to accommodate one owner's disability, and other requests for accommodation or accessibility would soon follow suit and erode the historic character of the neighborhood.

58.     Notwithstanding the conclusions of the Landmarks Commission, the Illinois Historic Preservation Division, the Department of Buildings and the ZBA, OTTA President Karen Pfendler continued to assert, without any objective or good faith basis, that the proposed plan was out of character with the district, claiming the ZBA "made moot the existing residents' commitment to the district."

59.     On March 29, 2019, the OTTA issued an inflammatory press release announcing its lawsuit that included demonstrably false information about Plaintiffs, saying: "The owners did not act in good faith and only met with the Alderman and the Old Town Triangle Association (OTTA) after a Stop Work Order was issued by the City of Chicago."

60.     On August 22, 2019, the state court dismissed the Complaint in its entirety without prejudice. On September 12, 2019, the OTTA filed an amended Complaint. Further state court proceedings remain pending.

61.     Despite its failure to persuade any governmental agency that Plaintiffs' accessibility modifications were improper, the OTTA's campaign against Plaintiffs has had its desired effect: many neighbors responded to the OTTA's provocation by harassing the family. In July 2019, after construction began, one neighbor confronted the construction crew, calling them "motherfuckers" and demanding the crew "show me your face," while taking pictures with his phone's camera. The same day, a pile of dog feces was left in the driveway of the Property. Two

days later, the lock to the construction site was vandalized and destroyed. A few days after that, another bag of dog feces was left in the front yard.

62.    These events left Plaintiffs feeling threatened, intimidated, unwelcome, and unsafe at their own property. The family feel like they must be personally on guard when at the Property, and the anxiety has caused Ava and Ms. Diehlmann to altogether avoid visiting the Property. The family filed a police report and purchased a security camera for the property in case of additional vandalism, and they worry that the campaign waged by the OTTA will escalate into physical violence. They also sent a formal letter to the OTTA asking them to stop these acts of aggression.

63.    Some neighbors took their harassment online to public forums on the Internet, where they made statements accusing Plaintiffs of "wheel[ing] their kid out to try and jumpstart the rage machine," and have repeatedly asserted that Plaintiffs should have found another neighborhood:

    a.  "If your child is disabled, then you look for a place that accommodates that disability. You don't use your child as a pawn against a system meant to preserve historic architecture for ALL for your selfish needs. And I do say it is selfish to have a disabled child live in a 4-story home when you obviously have the means to make their life easier in a large, one-story unit."

    b.  "The point still stands, they bought the home after they knew their daughter's needs, they knew there would be hurdles, and now they are hitting one."

    c.  "If it is more money to modify, too bad, so sad. They bought this home knowing full well that it is a historic landmark, pushback was going to come from someone if they did not adhere to the historic standards of the street…."

64.     This extraordinary undertaking by the OTTA to prevent the construction of an accessible garage is unprecedented for the organization, despite several other controversial improvement projects in the Old Town Triangle in recent years. Indeed, OTTA has never before or since reacted with the same level of opposition to any of the other multiple property owners who have sought to construct a garage.

65.     While the OTTA has a history of opposition to certain zoning and land use projects in the Old Town Triangle, its campaign against Plaintiffs far exceeds any other opposition effort in which it has been involved since 2009. Of all its prior opposition efforts, the OTTA has never previously launched a petition, organized a campaign of harassment, publicized the dispute on social media, or filed suit in the Cook County Circuit Court to challenge a ZBA decision. And the campaign against Plaintiffs is the only one to result in personal harassment by members of the community. To Plaintiffs' knowledge, none of these prior proposed projects involved modifications made to accommodate a disability.

66.     On many other occasions the OTTA has actively supported similar construction projects, or treated projects far larger in scope with less hostility. For example, in February 2010, the City issued a permit to demolish a home listed as "Contributing" on the National Register of Historic Places Inventory ("NRHPI") with no opposition from the OTTA.

67.     After multiple redesigns between October 2012 and May 2013, the OTTA took no action to oppose the owner of 347 W. Menomonee in his desire to add a second story addition to his coach house. The March 2013 OTTA Board meeting minutes acknowledge "The neighbors didn't like it…so he redid his plan and re-presented…neighbors still didn't like it. So he moved to redoing something on the front…but Landmarks didn't like it. . . . and in spite of his neighbor's feelings, he will proceed with his plans." The NRHPI lists this property as

"Contributing" to the historical character of the neighborhood, the same designation as the Property.

68.     In February 2014, the OTTA gave its blessing to the construction of a garage with a roof deck at 1709 Hudson. Despite the fact that " two neighbors had objections relating to some proposed zoning exceptions," the HD/PZ still "sent letters to Landmarks and the Alderman" stating their approval of the project. This property is also listed as "Contributing" on the NRHPI.

69.     In September 2014, the HD/PZ "recommended for approval" a basement garage at 1709 Sedgwick even though "neighbors were specifically opposed to the addition of the garage door."

70.     Between April 2016 and May 2017, the OTTA campaigned against the addition of a second story to 411 W. Eugenie, a "Significant" house. The OTTA encouraged neighbors to attend the ZBA meeting to oppose the project, but the addition was approved anyway. After the approval, the OTTA took no further action.

71.      Between March 2017 and May 2017, the OTTA was able to temporarily delay the demolition of 1630 Sedgwick. After City approval, the OTTA took no additional action to halt the demolition.

72.     In March 2017, the HD/PZ approved the construction of a garage for 215-217 Eugenie. The NRHPI classifies the property as "Significant," which affords it more protection than 1848 N. Lincoln Avenue's "Contributing" status.

73.     In March 2019, the OTTA opposed the demolition of 1638 Sedgwick. After the demolition was approved by the Landmarks Commission on appeal, the OTTA took no further actions to stop the demolition.

74.     Most notably, on June 6, 2019, the Landmarks Commission approved the addition of a two-car garage to the building at 1743 N. Sedgwick Avenue, a property located in the Old Town Triangle just a quarter-mile from 1848 N. Lincoln Avenue. The N. Sedgwick property has been designated "Significant" by the National Register of Historic Places—the highest possible designation. In contrast, 1848 N. Lincoln Avenue is only designated as "Contributing."

75.     The OTTA was aware of the N. Sedgwick project, as President Karen Pfendler and HD/PZ members Gonzalez and Kubo all submitted letters in opposition to the Landmarks Commission and the OTTA sent a letter to the owners stating its opposition. But the OTTA filed no lawsuit or objection before the ZBA, sent no email blast, issued no press release, and started no "Change.org" petition designed to harass or intimidate the owners of 1743 N. Sedgwick.

76.     The vitriolic, no-holds-barred opposition the OTTA has encouraged in response to Plaintiffs' accessibility plans can only be distinguished in one way from the myriad other projects—including the construction of other garages or the full demolition of historic houses— the OTTA has supported or quietly opposed. As is made clear in the repeated words of OTTA Officers and Directors: they believe a family seeking accommodations for a family member with a disability should live somewhere else.

**INJURY TO PLAINTIFFS**

77.     As a direct and proximate result of Defendant's discriminatory practices described above, Plaintiffs have suffered, and continue to suffer, irreparable loss and injury, including, but not limited to, economic losses, injury to reputation, humiliation, emotional distress, loss of housing opportunities, and the deprivation of their housing and civil rights.

78.     The OTTA has attempted to mobilize hundreds of Plaintiffs' neighbors against them, resulting in repeated hostile actions taken toward Plaintiffs and their property. These acts

have had an enormous psychological toll on the family, including feelings of danger, panic, and dread. In particular, Mr. Deakin and Ms. Diehlmann worry about the long-term impact on Ava, who has felt preyed upon by the adults in the OTTA.

79.     Plaintiffs continue to maintain two properties while waiting for the renovations to be completed, and the OTTA's endless delays and opposition have already made housing unavailable to the family for a full year. The OTTA has intentionally and willfully sent a message to other individuals with disabilities: they are not welcome in the Old Town Triangle, and the OTTA will bring to bear all of its considerable resources to oppose their presence.

80.     Defendant or its agents knew that Ava had a disability, and acted intentionally and willfully, with callous and reckless disregard for the statutorily protected rights of Plaintiffs, entitling Plaintiffs to punitive damages.

81.     Unless enjoined, Defendant or its agents will continue to engage in unlawful discrimination, with the purpose and effect of preventing Plaintiffs from enjoying their fair housing rights. Plaintiffs are now suffering, and will continue to suffer, irreparable injury from Defendant's discriminatory acts unless relief is provided by this Court.

## CAUSE OF ACTION

### COUNT ONE

### Violation of the Fair Housing Act

82.     Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 to 81 above.

83.     Through its actions and those of its agents, as described herein, Defendant made unavailable or denied a dwelling to Plaintiffs because of Ava's disability in violation of 42 U.S.C. § 3604(f)(1).

84.     Through its actions and those of its agents, as described herein, Defendant discriminated against Plaintiffs in the terms, conditions, and privileges of sale of a dwelling because of Ava's disability in violation of 42 U.S.C. § 3604(f)(2).

85.     Through its actions and those of its agents, as described herein, Defendant made repeated statements with respect to the sale or rental of a dwelling indicating a preference, limitation, or discrimination based on handicap in violation of 42 U.S.C. § 3604(c).

86.     Through its actions and those of its agents, as described herein, Defendant engaged in coercion, intimidation, threats, or interference with Plaintiffs' exercise or enjoyment of their rights under 42 U.S.C. § 3617.

87.     Defendant's acts in violation of the Fair Housing Act statutes caused Plaintiffs' injuries as detailed above.

88.     Defendant's actions were willful and/or taken in reckless disregard for the civil rights of Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court grant the following relief:

(1)     enter a declaratory judgment finding that the foregoing actions of Defendant violate the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3601, *et seq.*,

(2)     enter a permanent injunction directing Defendant and its agents and employees to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

(3)     award compensatory damages to Plaintiffs in an amount to be determined by a jury that would fully compensate them for all damages that have been caused by the conduct of Defendant alleged herein;

(4)     award punitive damages to Plaintiffs in an amount to be determined by a

jury that would punish Defendant for the willful, wanton, and reckless conduct alleged

herein and that would effectively deter similar conduct in the future;

(5)     award Plaintiffs their reasonable attorney's fees and costs; and

(6)     order such other relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all issues so triable as of

right.

Respectfully submitted,                                    Dated:  December 17, 2019

/s/  Michael Allen
Michael Allen*
Tahir Duckett*
RELMAN, DANE & COLFAX PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
Tel: (202) 728-1888
Fax: (202) 728-0848
mallen@relmanlaw.com
tduckett@relmanlaw.com

*pro hac vice application to be filed

Kenneth M. Walden
Mary Rosenberg
Access Living of Metropolitan Chicago
115 West Chicago Avenue
Chicago, IL 60654
Tel: 312-640-2136
Fax: 312-640-2101
TTY: 312-640-2102
kwalden@accessliving.org
mrosenberg@accessliving.org

*Attorneys for Plaintiffs*